J-S52008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| SECHRIST CONSTRUCTION, INC., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ROBERT J. HARPSTER, | |
| Appellant | No. 1393 MDA 2017 |

Appeal from the Order Entered September 1, 2017
In the Court of Common Pleas of Cumberland County
Civil Division at No(s): 12-7259

BEFORE:  BENDER, P.J.E., MCLAUGHLIN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED NOVEMBER 20, 2018**

Appellant, Robert J. Harpster, appeals *pro se* from the trial court's September 1, 2017 order directing the prothonotary to enter judgment in favor of Appellee, Sechrist Construction, Inc., in the amount of $129,579.72.[1] We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] We note that "[a]n appeal to this Court can only lie from judgments entered subsequent to the trial court's disposition of post-verdict motions…." ***Stahl Oil Co., Inc. v. Helsel***, 860 A.2d 508, 511-12 (Pa. Super. 2004) (citation omitted).  Although the trial court in the case *sub judice* directed the prothonotary to enter judgment on the jury's verdict upon disposing of the parties' post-trial motions, the docket reflects that the prothonotary did not do so.  ***See*** Pa.R.A.P. 301(c) ("[A] direction by the lower court that a specified judgment, sentence or other order shall be entered, unaccompanied by actual entry of the specified order in the docket, does not constitute an appealable order.  Any such order shall be docketed before an appeal is taken."); ***see***

The trial court provided a thorough summary of the procedural history

and factual background of this case as follows:

> In this civil case involving a breach of contract in the construction of a residence, [Sechrist Construction], a Pennsylvania corporation engaged in the business of contracting, sued [Mr. Harpster] for [Mr. Harpster's] failure to timely pay [Sechrist Construction] amounts specified in the construction contract and for [Mr. Harpster's] alleged interference with [Sechrist Construction's] timely completion of its duties under the contract. [Mr. Harpster] counter-sued [Sechrist Construction] for unsatisfactory workmanship in the construction of his residence, which formed the basis of [Mr. Harpster's] breach of contract counter-claim against [Sechrist Construction]. A jury trial was held on March 27-30, 2017, after which the jury found in favor of [Sechrist Construction] on [its] claim and [Mr. Harpster's] counter-claim and awarded [Sechrist Construction] $102,568.96 in damages. Accordingly, this [c]ourt entered an [o]rder in favor of [Sechrist Construction] on March 30, 2017. Following a post-judgment motion by [Sechrist Construction] to mold the jury verdict to include statutory interest, this [c]ourt entered an [o]rder molding the verdict to include pre[-]judgment interest at the statutory rate of 6% per annum for a total of $129,579.72 on August 21, 2017. On August 29, 2017, this [c]ourt denied [Mr. Harpster's] [m]otion for [p]ost-[t]rial [r]elief. [Mr. Harpster] filed a [n]otice of [a]ppeal on September 5, 2017. Pursuant to Pa.R.A.P. 1925(b), [Mr. Harpster] filed [a] statement of errors complained of on appeal….[8]

---

*also* Comment to Pa.R.A.P. 301 ("[A]n appeal is premature where the [c]ourt directs that a judgment [of] sentence or order be entered in the docket and the prothonotary fails to do so.") (citing ***Friedman v. Kasser***, 438 A.2d 1001 (Pa. Super. 1981)). Nevertheless, in similar circumstances where a prothonotary has failed to enter judgment on the docket in spite of a trial court's order to do so, this Court — in the interest of judicial economy — has elected to "regard as done that which ought to have been done" and considered the appeal to be properly before it. ***Stahl***, 860 A.2d at 512 (citations and internal quotation marks omitted). We further discern that, as in ***Stahl***, the docket in the case at bar indicates that both parties received notice of the trial court's order for the prothonotary to enter judgment in Sechrist Construction's favor. ***See id.*** Thus, we will likewise treat this appeal as being properly before us.

8 [Mr. Harpster] filed a [s]upplemental [Rule] 1925(b) statement on October 24, 2017. This [c]ourt, pursuant to an [o]rder dated December 1, 2017, denied consideration of [Mr. Harpster's] supplemental [Rule] 1925(b) statement. [The trial court] subsequently denied [Mr. Harpster's] request for reconsideration of [the] December 1, 2017 [o]rder on January 12, 2018. Therefore, the arguments raised in [Mr. Harpster's] supplemental [Rule] 1925(b) statement will not be addressed….

…

[Sechrist Construction's] evidence in support of its claim for breach of contract against [Mr. Harpster] was as follows:

[Sechrist Construction] and [Mr. Harpster] entered into a contract for the construction of [Mr. Harpster's] home on February 3, 2012. The contract included specifications for the home to guide how the project was to be completed, and a "draw schedule" to specify when and how much [Sechrist Construction] would be paid for its performance. It also contained language which provided that in the event of a breach, the non-breaching party could collect 10% of the remaining balance of the contract from the breaching party as liquidated damages. [Mr. Harpster] paid the first three draws to [Sechrist Construction], but withheld payment of the fourth and final draws.

Eric Sechrist, the owner of [Sechrist Construction], testified that [Mr. Harpster] did not follow his advice.[16] [Mr. Harpster] insisted on interviewing all of [Sechrist Construction's] subcontractors before they could start work. [Mr. Harpster] made several changes once the work started. [Mr. Harpster] did work himself and hired his own subcontractors instead of using [Sechrist Construction's] subcontractors on several occasions, which delayed construction. [Mr. Harpster] was present at the work site most days, told [Sechrist Construction] and [Sechrist Construction's] subcontractors how to do their jobs, and made them redo work they had already finished.[21] [Mr. Harpster] often insisted on more or different work and changes that caused unnecessary delay.[22] [Eric Sechrist] always accommodated [Mr. Harpster's] requests, often paying for changes himself. [Mr. Harpster's] interference kept [Sechrist Construction] from completing the project by the deadline.

[16] [Eric Sechrist] advised [Mr. Harpster] before the project began that he should change the grade of the home by filling

- 3 -

the excavation hole and impacting the fill to improve future drainage of the home; [Mr. Harpster] declined to make these changes. On cross-examination, [Mr. Harpster] denied ever having this conversation with [Eric Sechrist]. [Eric Sechrist] also advised [Mr. Harpster] to use soil to backfill around the garage and front of the house to improve drainage, but [Mr. Harpster] wanted to use stone and executed a change order to that effect.

[21] [Mr. Harpster] made [Sechrist Construction] dig up rocks and clean them. [Mr. Harpster] made the roofer redistribute unplaced shingles to different areas of the roof.

[22] [Mr. Harpster] changed the type of mortar to be used in the basement after the mortar had been delivered to the job site. [Mr. Harpster] would only allow specific pieces of lumber to be used. [Sechrist Construction] shut down the project for 1-2 days while awaiting delivery of new trusses because [Mr. Harpster] would not accept the ones that were delivered. [Mr. Harpster] wanted different kitchen cabinets than the ones [Sechrist Construction] would provide, at a cost of about twice the allowance under the construction loan. [Sechrist Construction], the waterproofing subcontractor, and the excavator returned to the jobsite several times to do additional work when [Mr. Harpster] wanted to raise the grade of the house.

[Eric Sechrist] received an email from [Mr. Harpster] terminating him from the job on November 9, 2012. The email stated that [Sechrist Construction] was forbidden from doing any more work on the property until further notice. [Eric Sechrist] was instructed to remove everything, including his tools, from the property. As a result, [Sechrist Construction] was prevented from further performance under the contract. Even though [Mr. Harpster] never released the final two draws, [Eric Sechrist] paid all of his subcontractors in full for their work.

The manager from [Mr. Harpster's] lending bank testified that before the bank would approve any draws on a construction loan, certain specific portions of the work had to be done on the project and the bank's appraiser would have to do an inspection and authorize release of the funds. The bank's appraiser testified that the draw schedule attached to the parties' agreement was a boilerplate schedule prepared by the bank, and that the work necessary to release each draw could vary from builder to builder

- 4 -

depending on how they organized the build timeline. The actual release of funds under each draw was based upon the appraiser's judgment of whether an adequate amount of progress had been made since the last draw, and not on exactly what was written on the draw schedule. It is common practice to approve a draw even if every single item has not been completed at that point. The appraiser personally inspected the property prior to the release of each draw, and on October 21, 2012, found that the progress on the construction was adequate to release the fourth draw to [Sechrist Construction]. The Fairview [T]ownship[35] building inspector also testified that he inspected the house at various times during construction and everything was up to code. [Mr. Harpster] contacted the lender in order to stop payment to [Sechrist Construction] on the fourth draw. The fourth and fifth draws were paid directly to [Mr. Harpster].

[35] The subject property at issue here is located in Fairview Township.

Darrick Trout, [Sechrist Construction's] waterproofing technician, testified that he took extra care and time to apply the waterproofing membrane to the walls and [gauged] his work as he went to ensure that every area of the membrane was done correctly and was the proper thickness. He applied the waterproofing according to the manufacturer's warranty, and a water test showed that there was no water infiltration into the basement through the membrane. Upon questioning regarding sagging in the membrane, Mr. Trout testified that sagging in the material once sprayed is typical where there is extra thickness, and is not a concern as to the quality of the waterproofing material or its application.[42] Gary Albright, another of [Sechrist Construction's] subcontractors who assisted with waterproofing the foundation and basement, witnessed a water test that was performed by Tremco.[43] No water was infiltrating into the basement during that test, except where the technician specifically placed a hose against a non-waterproofed block to show [Mr. Harpster] how the waterproofing worked. [Eric Sechrist] personally observed another waterproofing test on the basement, and no water infiltration was observed at that time. Any water infiltration or drainage problems on the property that might have occurred after [Sechrist Construction] stopped work was the fault of [Mr. Harpster].[46] [Sechrist Construction's] engineering expert also investigated whether there was water infiltration in [Mr. Harpster's] basement in February of 2013 and again in March 2017. He used two types of moisture readers to

measure the moisture whenever he saw efflorescence. The moisture levels on the walls' surface were within or below the normal range. There was no water infiltration. Any moisture [Mr. Harpster] experienced could be remedied by applying a coat of special paint to the walls before finishing the basement.

[42] Bubbling of the material is also not a concern as long as the minimum thickness of the material has been met in those areas.

[43] Tremco is the manufacturer of the waterproofing membrane that was used on [Mr. Harpster's] home.

[46] After [Sechrist Construction] ceased working on the property, [Mr. Harpster] hired his own subcontractors to fill the garage and driveway area with materials other than those initially recommended by [Sechrist Construction]. The manner in which those contractors completed the final grading of the home only served to exacerbate any drainage issues.

The Ivany block[52] manufacturer testified that [Mr. Harpster] was provided with the specifications for the generic Ivany block at the beginning of the project and did not object to its use. He also stated that the primary difference between generic and trademarked Ivany block is compression strength.[54] Tests done on the two blocks also reveal that the generic block that was actually used was superior in quality to the trademarked block with respect to water absorption.[55]

[52] Ivany block is the type of block that was used in the subject property's basement.

[54] The trademarked Ivany block had a compression strength of 3,000 [pounds per square inch (PSI)] and the generic block used for the project has 2,200 PSI. The witness stated that PSI was not relevant to the performance of the block except in high-rise construction.

[55] The generic block has a capacity to absorb 11.6 pounds of water per cubic foot and the trademarked block has an 11.9 [pound] capacity. Although negligibly different in this case, a lower absorption rate is generally better to prevent moisture intrusion.

[Mr. Harpster's] landscaper is a former personal friend of [Mr. Harpster]. He did excavation work on the property before [Sechrist Construction] was hired and built drain spouts, finished the retainer wall, and put in the lawn after [Sechrist Construction] was no longer on the job. [Mr. Harpster] did not pay him for all of the work that he did. Robert Ott was a painter that was originally a subcontractor for [Sechrist Construction], but became [Mr. Harpster's] subcontractor as a favor to [Mr. Harpster] because he knew him personally and to save [Mr. Harpster] money. He was fired by [Mr. Harpster] after finishing almost all of his painting work,[61] and was not paid the final one-third of what he was owed by [Mr. Harpster].

[61] [Mr. Harpster] complained about the paint job and fired the witness before giving him the chance to correct the perceived problem.

[Mr. Harpster's] evidence in support of his counter-claim for breach of contract against [Sechrist Construction] was as follows:

[Mr. Harpster] testified that [Sechrist Construction] breached the contract by not providing the trademark Ivany block specified in the contract,[63] not completing the construction of the home, and performing a myriad of things inadequately under the contract. There were problems in the construction that [Mr. Harpster] uncovered on his own and brought to others' attention to be corrected.[65] There were other problems that [Mr. Harpster] had to correct by himself.[66] [Mr. Harpster] has to constantly run a dehumidifier in the basement and cannot use the basement.[67] Time and completion of construction has not remediated the water infiltration issue in the basement. Water containment on the outside of the property also continues to be an issue.

[63] [Mr. Harpster] chose the trademarked Ivany block because of a brochure that [Sechrist Construction] had provided to him, and getting that exact block was an important part of the contract.

[65] The water line had to be moved. The sewer lines in the basement were hazardously placed. Two roof trusses were cracked. Rough plumbing had to be moved.

[66] [Mr. Harpster] squeegeed water that was pooling on the sub-floors. He purchased tarps to prevent the sub-floors from becoming dirty. [Mr. Harpster] hired a subcontractor

to backfill so he could have a driveway and porch due to originally incorrect grading.

[67] [Mr. Harpster] also stated he observed mold growth in the basement.

At the time the "termination" email was sent to [Sechrist Construction], [Mr. Harpster] was still interested in maintaining a contractual relationship with [Sechrist Construction]. [Mr. Harpster] did not release the fourth and final draws to [Sechrist Construction] because portions of the work that were to be completed before the fourth could be paid were not done,[72] and [Mr. Harpster] did not want to give [Sechrist Construction] any more money until the water infiltration issue in the basement was resolved.

[72] The final electrical work, installation of kitchen appliances, and retaining walls were not completed. According to the draw schedule, these items were to be finished before the fourth draw was authorized. [Mr. Harpster] understood that the manufacturer had to be paid before the kitchen cabinets and tops would be installed. [Sechrist Construction] testified that it is typical to pay for installation of the kitchen after it is completed, to make sure the materials are satisfactory.

[Mr. Harpster's] expert engineer testified that in November of 2014 and again in March 2015[,] he personally investigated whether there was water infiltration in [Mr. Harpster's] basement. He determined that there was and continues to be moisture in the basement caused by the voids in the waterproofing membrane, and not as the result of condensation. He also stated that the final grading of a house is an integral factor ensuring that water will drain away from the home effectively and maintaining the effectiveness of a waterproofing membrane.[76]

[76] The final grading of the house was performed by [Mr. Harpster].

Trial Court Opinion (TCO), 1/19/2018, at 1-2, 5-11 (most footnotes and citations to the record omitted).

Mr. Harpster presently raises the following issues for our review, which we have reordered for ease of disposition:

- 8 -

1. Did the trial court commit reversible error and abuse its discretion and misapply the law by improperly charging the jury relative to the facts of the case by not setting forth breach of contract conditions which contributed to a verdict not supported by the weight of the evidence including:

   a. Anticipatory Breach/Repudiation of Contract?

   b. Material and Immaterial Breaches of Contract?

   c. Clear and Convincing Evidence?

   d. Burden of Proof – Oral Modifications of a Written Contract with No Oral Modification Clause?

   e. Damages or Nondisclosure?

2. Did the trial court commit reversible error and abuse its discretion and misapply the law by not disclosing in its entirety an *ex parte* [*i*]n [*c*]amera discussion with a juror who[] expresse[d] confusion about ongoing testimony, raise[d] other issues and question[ed] the fairness of the court system?

3. Did the trial court commit reversible error and abuse its discretion and misapply the law by permitting [Sechrist Construction's] attorney to mislead the jury and the trial court with untrue and misleading statements which contributed to a verdict not supported by the weight of the evidence?

4. Did the trial court commit reversible error and abuse its discretion and misapply the law through molding the jury verdict and awarding [Sechrist Construction] pre-judgment interest not supported by an amount determinable nor to be determined from the terms and conditions of the contract?

Mr. Harpster's Brief at 9-10.

In Mr. Harpster's first issue, he claims that the trial court "improperly charg[ed] the jury relative to the facts of the case by not setting forth breach of contract conditions which contributed to a verdict not supported by the weight of the evidence." ***See id.*** at 55 (emphasis omitted). In its Rule

1925(a) opinion, the trial court determined that no relief was due, as "[n]either party raised an objection to any of the jury instructions in their final form, either before or after the jury was charged." TCO at 13 (footnote omitted). We agree.

> Our Supreme Court has recently explained:

> In order to preserve a jury-charge challenge for appellate review, a party must either: (1) lodge a contemporaneous objection on the record, or (2) make requested points for charge part of the record pursuant to Pa.R.C.P. 226(a), obtain an explicit trial court ruling upon the challenged instruction, and raise the issue in a post-trial motion.

***Jones v. Ott***, 191 A.3d 782, 789 (Pa. 2018) (plurality) (internal citations omitted).

Further, even if a jury-charge challenge is properly preserved in one of the above-stated ways, "[w]hen a trial judge directly asks for any objections, counsel must directly state them, explicitly or by reference to prior recorded objections, on pain of waiver." ***Id.*** at 792. Our Supreme Court expounded, "when the trial court specifically asks whether a party objects to a given charge, it is reasonable to expect that counsel will in fact object or remind the court of a previously offered instruction rather than abandon the point." ***Id.*** It added that, "an issue preserved at one stage (as in a submitted and ruled-upon point for charge) can be waived at another stage (such as by denying that there are any objections or by failing to include the issue in subsequent briefing)." ***Id.*** (citations omitted).

Here, in his brief, Mr. Harpster does not point us to where he preserved this claim at trial. Moreover, after the trial court gave its jury instructions, the following exchange occurred:

> [The trial court]: Counsel, do you have any corrections or additions to my jury instructions?
>
> [Mr. Harpster's counsel]: No, Your Honor.
>
> [Sechrist Construction's counsel]: No, Your Honor.

N.T. Trial, 3/30/2017, at 53.[2] Mr. Harpster did not directly state or refer to any prior objections when asked by the trial court if he had any corrections or additions to the jury instructions. Accordingly, we conclude that Mr. Harpster waived any issues challenging the trial court's jury instructions.[3]

In his second issue, Mr. Harpster argues that the trial court erred "by not disclosing in its entirety an *ex parte [i]n [c]amera* discussion with a juror who[] expresse[d] confusion about ongoing testimony, raise[d] other issues[,] and question[ed] the fairness of the court system[.]" Mr. Harpster's Brief at 80 (emphasis omitted). Mr. Harpster states that the trial court "misrepresented the contents of the discussion to Mr. Harpster's counsel[,]" and that "[t]he trial transcript with [the juror] was not provided by the [t]rial [c]ourt until May 2, 2017[,] which did not afford Mr. Harpster's counsel the

---

[2] We note that Mr. Harpster was represented by counsel at trial.

[3] We also reject Mr. Harpster's arguments that we should not strictly enforce the waiver doctrine due to, *inter alia*, judicial misconduct, unorthodox procedure utilized by the trial court, and/or detrimental effects on the jury. **See** Mr. Harpster's Brief at 7-8. Mr. Harpster has not demonstrated that any of those circumstances occurred.

opportunity to question the juror, request his removal, and prevent prejudicial impacts on the other jurors." *Id.* at 80, 81 (internal citations omitted).

With respect to this issue, the trial court explained that "[d]uring the trial, one of the jurors indicated through the [c]ourt's bailiff to the [c]ourt that he was having some trouble understanding what was going on and expressed that he wanted to be able to ask questions." TCO at 25 (footnote omitted).[4] The trial court described that, "[a]fter this [c]ourt consulted with the parties' attorneys, [Sechrist Construction's] attorney requested that the [c]ourt do an *in camera* interview of the juror to ensure that he was able to understand English and perform his duties adequately." *Id.* (footnote omitted) Thereafter, "[b]oth parties agreed that the [c]ourt would interview the juror on the record to establish the nature of his questions and to determine whether he was fit to serve." *Id.* (footnote omitted). Before questioning the juror, the trial court stated to counsel:

> [The trial court]: Okay. I am going to grant the request for me to put something on the record with this juror. That being said, I am going to lead him to a certain extent that it doesn't open the door for him to be asking other questions that aren't pertinent. I just want to be make sure [*sic*] that he is able to serve and that he understands what is happening in court even if he doesn't always understand confusing terms by attorneys, which some people have trouble talking about. So I will just ask him that my tipstaff made me aware that he had some questions about what was going on in court. I will reiterate that no juror can ask questions during the trial, and then I will ask him if he is able to hear okay and understand, basically, if he is able to hear what is going on and understand basically the English language. I am trying to think of another way to say it, but understand what the attorneys are

---

[4] This juror made this indication on the second day of the four-day trial.

saying even if he has questions about the substance of it all. That's how I'm going to pose it to him, okay?

So I will do that. Let's take our recess now and then I will try to get with that juror before we proceed.

[Sechrist Construction's counsel]: Thank you, Your Honor.

[Mr. Harpster's counsel]: Thank you, Your Honor.

N.T. Trial, 3/28/2017, at 135.

During the trial court's questioning of the juror, the juror indicated that he "understand[s] ninety-nine percent [of] whatever is going on." *Id.* at 136. He elaborated that he "understand[s] completely what is going on. But sometimes I would like to ask questions like to all of this – the Defendant, the Plaintiff, their lawyers, they have been in this case for years, since 2012, but right now we are like, what, second day? You see, and right now we are deeply involved in this way." *Id.* at 136-37. He expressed that "something is wrong with the system" because jurors freed O.J. Simpson, and Steve Avery "was sentenced in 1985 for 32 years, and only in 18 years he was freed with a DNA test because of jurors again." *Id.* at 138-39.[5]

Nevertheless, the juror agreed he could be objective:

[The trial court]: I hear you objecting to the way that the justice system is set up, and I understand your objections. I just want to make sure that you understand though that it is my job to tell you what the law is, and so you would have to follow what the law is. Do you think that you would be able to follow what the law is?

[The juror]: (unintelligible)

[The trial court]: You will?

---

[5] Steve Avery was the subject of the Netflix documentary "Making a Murderer."

[The juror]: One hundred percent.

[The trial court]: Okay.

[The juror]: For sure.  I am obedient, so whatever the law I will [*sic*].

[The trial court]: And you are willing to do that even though you can't ask questions of the attorneys and their witnesses?

[The juror]: For sure, yeah.  I am completely fine with it.

[The trial court]: Okay, great.

[The juror]: I am completely fine.

[The trial court]: Thank you.  Do you have anything else that you need to tell me about in terms of anything, any reason that you feel that you can't serve or otherwise?

[The juror]: No.  I can serve.  I didn't say that I can't serve.

[The trial court]: I just want to make sure.

[The juror]: Completely.  And I will be as objective as one hundred percent.

*Id.* at 140-41.

When the trial court reconvened with the parties' attorneys after recess, it explained:

[The trial court]: I was able to speak with that juror on the record and he indicated that he has a degree from [Harrisburg Area Community College].  I think he also indicated that he has an engineering degree.  Did I get that right, Vicky?

[Court Reporter]: Yes, Your Honor.

[The trial court]: So he had an engineering degree [*sic*].  He is able to understand English just fine.  He is completely fine.  His issue was that he said that he didn't like that basically everybody surrounding the case has more knowledge, that jurors are not allowed to ask questions, whereas everybody else can.  And I explained to him that that was the law in Pennsylvania, and I asked him, if he would make sure, that he would be able to follow the law, and if he was having issues with hearing anything,

- 14 -

anything of that sort. So he told me he was able to follow the law, and he would be absolutely obedient to the law as I give it to him.

So, that's the end of that.

Ready?

[Mr. Harpster's counsel]: Yes, Your Honor.

[Sechrist Construction's counsel]: Yes, Your Honor.

*Id.* at 142-43.

We do not agree that the trial court "misrepresented" the contents of its discussion with the juror. *See* Mr. Harpster's Brief at 80. The gist of the conversation was that the juror wanted to ask questions and expressed that our justice system had flaws, but indicated he adequately understood what was going on at trial and stated that he would be objective. The trial court conveyed just that to counsel. Further, as the trial court discerned, "neither party asked to see the transcript of the conversation nor objected to the service of the juror." TCO at 26 (footnote omitted). Thus, we likewise deem this issue waived. *See Jones*, 191 A.3d at 787 ("In order to preserve an issue for appellate review, a litigant must place a timely, specific objection on the record. Issues that are not preserved by specific objection in the lower court are waived.") (citations omitted).[6]

_____

[6] Mr. Harpster also suggests that the trial court committed reversible error by not permitting jurors to ask questions during trial. *See* Mr. Harpster's Brief at 81-82. He argues that, "[a]s a result of [the t]rial [c]ourt's misapplying Pennsylvania [l]aw, it eliminated the opportunity for [the juror['s] wanting to ask questions] and potentially other jurors to ask questions for evaluating and weighing the evidence." *Id.* at 82-83. Again, Mr. Harpster has waived this argument. As Sechrist Construction points out, "the [j]udge twice repeated

In his third issue, Mr. Harpster argues that the trial court erred "by permitting [Sechrist Construction's] attorney to mislead the jury and the [t]rial court with untrue and misleading statements which contributed to a verdict not supported by the weight of the evidence[.]" Mr. Harpster's Brief at 86 (emphasis omitted). Focusing on Sechrist Construction's closing argument, Mr. Harpster contends that "Sechrist [Construction's] counsel pursued a pattern of misconduct from opening statement through final argument with cavalier and baseless statements about Mr. Harpster's character, testimony, and counterclaim and 'kicking individuals off the job'…." *Id.* at 88. Once again, we deem this claim waived.

Mr. Harpster says that he preserved this issue "in [his] post-trial motions, post-trial supporting brief Appendix A (19 pages), [Rule] 1925(b) [statement,] and … the [t]rial [c]ourt's review of the record for misconduct." *Id.* at 86-87. However, Mr. Harpster does not claim that he made any timely objections at trial when Sechrist Construction made any of the at-issue statements during closing argument. *See Jones*, 191 A.3d at 787 (citations omitted). Thus, this claim is also waived.

In his last issue, Mr. Harpster avers that the trial court erred "by molding the jury verdict award to include pre-judgment interest on an amount not determinable or to be determined by the contract for incomplete work and

---

this legal position [that jurors were not permitted to ask questions during trial], both before and after she had the conversation with [the juror], and [Mr.] Harpster's counsel did not object to or challenge the trial court's stated position." Sechrist Construction's Brief at 23-24 (citations omitted).

outstanding allowances owed by Sechrist [Construction]."  Mr. Harpster's Brief at 73-74 (citation omitted).  We disagree.

"Our review of an award of pre-judgment interest is for abuse of discretion."  **Cresci Const. Services, Inc. v. Martin**, 64 A.3d 254, 258 (Pa. Super. 2013) (citation omitted).  However, "a court has discretion to award or not award pre[-]judgment interest on some claims, but must or must not award pre[-]judgment interest on others."  **Id.** (citations, internal quotations marks, and original brackets omitted).

> In more detail, our Supreme Court has explained,
>
> even where a party's right to the payment of interest is not specifically addressed by the terms of a contract, a nonbreaching party to a contract may recover, as damages, interest on the amount due under the contract; again, this Court refers to such interest as pre[-]judgment interest.  The purpose of awarding interest as damages:
>
>> is to compensate an aggrieved party for detention of money rightfully due him or her, and to afford him or her full indemnification or compensation for the wrongful interference with his or her property rights.  The allowance of interest as an element of damages is not punitive, but is based on the general assumption that retention of the money benefits the debtor and injures the creditor.
>
> Many jurisdictions have enacted statutory provisions for interest as damages.  In 1988, in **Fernandez [v. Levin**, 548 A.2d 1191 (Pa. 1988),] this Court adopted Section 354 of the Restatement (Second) of Contracts as the law of this Commonwealth with respect to the recovery of interest as damages in breach of contract actions.  Section 354, titled "Interest As Damages," provides:
>
>> (1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from

the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Restatement (Second) of Contracts § 354. In adopting Section 354, we stated:

For over a century it has been the law of this Commonwealth that the right to interest upon money owing upon contract is a legal right. That right to interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment.

With regard to pre[-]judgment interest, we have explained, interest has been defined to be a compensation allowed to the creditor for delay of payment by the debtor, and is said to be impliedly due whenever a liquidated sum of money is unjustly withheld. However, as prerequisites to running of pre[-]judgment interest, the debt must have been liquidated with some degree of certainty and the duty to pay it must have become fixed. Thus, even where the terms of a contract do not expressly provide for the payment of interest, a nonbreaching party has a legal right to recover interest, as damages, on a definite sum owed under the contract.

Furthermore, as is the case with an award of contractual interest, an award of pre[-]judgment interest under Section 354(1) is not subject to a court's discretion.

*TruServ Corp. v. Morgan's Tool & Supply Co., Inc.*, 39 A.3d 253, 263-64 (Pa. 2012) (internal footnotes, quotation marks, original brackets, and some citations omitted).

Here, the trial court awarded pre-judgment interest, explaining that "the parties had a contract which provided that certain amounts were to be paid by [Mr. Harpster] in exchange for performance by [Sechrist Construction] over several different time periods for the construction of [Mr. Harpster's] home."

- 18 -

TCO at 14 (footnote omitted). It added that "[t]he contract also included reciprocal provisions that in the event of a breach, liquidated damages in the amount of ten percent (10%) of the remaining balance of the contract would be paid by the breaching party to the non-breaching party." *Id.* (footnote omitted). It concluded that "[t]hese amounts were certain and determined by the parties at the time of contracting, and were clearly expressed by the terms of the contract. Furthermore, at trial, the parties stipulated that $102,568.96 was the correct amount of damages for purposes of [Sechrist Construction's] claim, not including statutory interest." *Id.* (footnotes omitted).

We agree that Sechrist Construction should receive pre-judgment interest. Sechrist Construction claims that Mr. Harpster owes it a total of $102,568.96, as set forth below:

| | |
|---|---|
| a. Fourth draw due | $ 78,854.00 |
| b. Final draw due | $ 39,427.00 |
| c. Balance due on unpaid change orders | $  5,893.39 |
| Subtotal | $124,174.39 |
| Less credit for work not completed and unused allowance credits | $ 30,929.88 |
| Balance due: | $ 93,244.51 |
| 10% Liquidated Damages | $  9,324.45 |
| TOTAL DUE | $102,568.96 |

Sechrist Construction's Brief at 8.

Mr. Harpster specifically claims that the amounts for "incomplete work and outstanding allowances owed by Sechrist [Construction]" are not determinable from the contract, thereby precluding an award of pre-judgment interest. Mr. Harspter's Brief at 73-74. He states that "[t]he value of Sechrist[ Construction's] incomplete work could not be determined by the contract and specifications[,]" *id.* at 74 (unnecessary capitalization and citations omitted), and "Sechrist [Construction] failed to provide invoices, estimates, or established market prices to substantiate outstanding construction funds 'allegedly' owed for all completed and incomplete work." *Id.* at 75.

We deem instructive **Burkholder v. Cherry**, 607 A.2d 745 (Pa. Super. 1992). In **Burkholder**, a contractor sued homeowners to recover money due under a residential construction contract. *Id.* at 746. The contract price set forth in the contractor's complaint was $64,185.00, and the contractor also claimed $3,589.19 for "extras" purportedly ordered by the homeowners. *Id.* The contractor conceded that the homeowners already paid $35,301.75 of the total amount due, leaving a purported balance of $32,472.44. *Id.* The contractor subsequently amended the complaint to add an alternate count in *quantum meruit*, in which he claimed that the homeowners received benefits in the amount of $19,618.95. *Id.* The homeowners later filed a counterclaim for damages, averring that the contractor's work was incomplete and defective. *Id.* Following trial, the jury returned a verdict in the amount of $18,000.00 in favor of the contractor. *Id.* The trial court thereafter molded the verdict to include $5,154.14 in pre-judgment interest. *Id.*

The homeowners filed an appeal challenging, *inter alia*, the trial court's award of pre-judgment interest. ***Id.*** On appeal, the homeowners argued that "it is impossible to determine whether the recovery allowed by the jury was for *quantum meruit* or based on the price established by the contract[,]" and that "the jury may have allowed some or all of [the homeowners'] counterclaim and, if so, the amount of the claim was unascertainable." ***Id.*** at 747. In response, we determined, "[w]hether the damages were based on the terms of the contract or on *quantum meruit*, it is clear that the owners have had the use of the contractor's money since the date on which it was due. The amount owed, moreover, was sufficiently ascertainable so that a tender could have been made." ***Id.*** at 748. Thus, we held that "where, as here, the claim is for work done and services rendered, the claimant is entitled to recover pre-judgment interest." ***Id.*** Moreover, we noted that "the amount of the claim is not rendered unascertainable, for purposes of determining whether pre-judgment interest is recoverable, merely because the breaching party has asserted a counterclaim. Otherwise, a breaching party could always defeat a claim for pre-judgment interest by filing a counterclaim." ***Id.***

In the case *sub judice*, Sechrist Construction's claim is likewise for work done and services rendered. It is also clear that Mr. Harpster has had the benefit of Sechrist Construction's money since it came due in 2012. We also conclude that the amount due was no less ascertainable than the amount in ***Burkholder***. To the extent Mr. Harpster challenges the evidence (or lack thereof) that Sechrist Construction proffered to support the value of its claim,

we remind Mr. Harpster that the parties stipulated to the amount of damages Sechrist Construction was seeking at trial, and the jury awarded that exact amount. *See* TCO at 14. Accordingly, the trial court did not err in awarding pre-judgment interest to Sechrist Construction.

Finally, Mr. Harpster filed an application for relief pursuant to Pa.R.A.P. 2155(b), requesting that we order Sechrist Construction to reimburse him $1,014.00, because Sechrist Construction requested that Mr. Harpster include its exhibits in the reproduced record, and he purports that 348 pages of those exhibits were superfluous for purposes of this appeal. We decline to grant Mr. Harpster's request for reimbursement.

Rule 2155 sets forth:

**(a) General rule.** Unless the parties otherwise agree the cost of reproducing the record shall initially be paid by the appellant, but if the appellant considers that parts of the record designated by the appellee for inclusion are unnecessary for a determination of the issues presented the appellant may so advise the appellee and the appellee shall advance the cost of including such parts. If the appellee fails to advance such costs within ten days after written demand therefor, the appellant may proceed without reproduction of the parts of the record designated by appellee which the appellant considered to be unnecessary.

**(b) Allocation by court.** The cost of reproducing the record shall be taxed as costs in the case pursuant to Chapter 27 (fees and costs in appellate courts and on appeal), but if either party shall cause material to be included in the reproduced record unnecessarily, the appellate court may on application filed within ten days after the last brief is filed, in its order disposing of the appeal impose the cost of reproducing such parts on the designating party.

Pa.R.A.P. 2155.

Here, the record indicates that Mr. Harpster initially filed an application for relief on March 23, 2018, requesting that this Court order Sechrist Construction to provide "advance payment for all challenges of [Sechrist Construction's] Designation of Additional Parts to be Reproduced pursuant to Rule 2155 which are deemed to be unnecessary, duplicative, and overly burdensome." **See** Mr. Harpster's Application for Relief, 3/23/2018, at ¶ 9.[7] In that request, he did not allege that he had previously made a demand for advance payment on Sechrist Construction pursuant to Rule 2155(a).

On March 30, 2018, Sechrist Construction filed a response, in which it stated that "[t]o the extent [Mr. Harpster] can identify particular exhibits that are duplicative, [Sechrist Construction] would consider withdrawing its designation of those exhibits to be reproduced as part of the Reproduced Record." **See** Sechrist Construction's Response, 3/30/2018, at ¶ 3. In fact, it even declared that, "[t]o the extent that exhibits attached to [Sechrist Construction's c]omplaint duplicates exhibits referenced in [Mr. Harpster's] designation of the record…, [it] is willing to withdraw its designation of those documents to the extent they are duplicative." **Id.** at ¶ 5. It also averred that Mr. Harpster "did not request advance payment from [Sechrist Construction]. … This is the first [Sechrist Construction] is learning of [Mr.

---

[7] Sechrist Construction had designated the following as additional parts of the reproduced record: (1) all exhibits to its complaint; (2) all additional parts of the trial transcript to make a complete copy of the trial transcript; and (3) all of its exhibits admitted into evidence at trial. **See** Sechrist Construction's Designation of Additional Parts of Record Pursuant to Pa.R.A.P. 2154(a), 3/15/2018 (single page).

Harpster's] alleged objections." *Id.* at ¶ 8. Further, Sechrist Construction represented that "[i]t is specifically denied that [Mr. Harpster] has appropriately identified the exact costs [he] is requesting [Sechrist Construction] to advance. Therefore, it is impossible for [Sechrist Construction] to comply with the Rules until [he] provides a reasonable calculation of the requested additional costs to be advanced." *Id.* As an exhibit to its response, Sechrist Construction attached a letter it sent that same day to Mr. Harpster. Therein, it explained to Mr. Harpster that, "since you have pointed out that you believe certain of those documents are unnecessary, it is incumbent upon you to … advise [Sechrist Construction] of the exact amount of the additional cost that the reproduction of those additional documents will generate so that we can forward a check advancing such costs to you pursuant to Rule 2155(a)." *Id.* at Exhibit A. It also asked Mr. Harpster to "provide … a calculation of the additional costs you contend will be incurred to produce the additional documents including an identification of the specific documents you contend are duplicative and/or unnecessary. Assuming you provide us with a reasonable calculation of such costs and identify the documents, we will consider whether or not to withdraw those designations." *See id.*

On April 12, 2018, we denied Mr. Harpster's application for relief in a brief, *per curiam* order. On June 18, 2018, Mr. Harpster filed his brief and the reproduced record. Following briefing by the parties, Mr. Harpster filed the August 14, 2018 application for relief currently pending before us, requesting

that we order Sechrist Construction to reimburse him $1,014.00, for designating allegedly unnecessary documents in the reproduced record. He reiterates his complaints that some exhibits are duplicative, and claims that Sechrist Construction referenced only a few pages of its exhibits in its brief. *See* Application for Relief, 8/14/2018, at ¶ 5 ("The request to reproduce all [of Sechrist Construction's] exhibits was overly burdensome and duplicative. To illustrate a few examples: [Mr. Harpter's] Exhibit A *incorporated* [Sechrist Construction's] Exhibits 1, 2, & 10….") (emphasis in original); *id.* at ¶ 7 ("[Sechrist Construction] requested that [Mr. Harpster] reproduce all [of its] exhibits and referenced only 9 pages throughout its brief."). In this application, Mr. Harpster does not acknowledge Sechrist Construction's March 30, 2018 letter.

On August 16, 2018, Sechrist Construction filed a response, claiming that Mr. Harpster "failed to respond to counsel's March 30, 2018 letter and proceeded to reproduce all designated parts of the record. Had [Mr.] Harpster responded to counsel's March 30 letter, Sechrist [Construction] would have had the benefit of considering whether or not to move forward with including all parts of the additional designation and paying for the costs associated therewith." *See* Sechrist Construction's Response, 8/16/2018, at ¶¶ 6, 7. According to Sechrist Construction, Mr. Harpster instead "made a unilateral decision to include all parts and incur the cost associated therewith, which was not a cost imposed on him by Sechrist [Construction]…." *Id.* at ¶ 8. Sechrist Construction argues that "[t]his is not the procedure contemplated by the

Rules...." *Id.* at ¶ 9. Mr. Harpster did not subsequently file a reply to Sechrist Construction's answer, or contest the allegation that he did not respond to the March 30, 2018 letter.

We agree with Sechrist Construction that Mr. Harpster is not due any relief. At the outset, the record reflects that Mr. Harpster did not attempt whatsoever to comply with Pa.R.A.P. 2155(a), or cooperate with Sechrist Construction. Sechrist Construction indicated its willingness to withdraw certain documents and compromise with Mr. Harpster, but Mr. Harpster apparently chose to ignore it. Had Mr. Harpster responded to Sechrist Construction, he likely could have avoided producing certain documents in the first place. Further, pursuant to Rule 2155(a), Mr. Harpster's initial remedy consisted of advising Sechrist Construction that he viewed certain documents as unnecessary and seeking for it to advance the cost of including such parts. *See* Pa.R.A.P. 2155(a), *supra.* In the absence of advance payment by Sechrist Construction, Mr. Harpster should not have produced the documents he considered duplicative and/or unnecessary. He chose not to comply with that Rule, despite Sechrist Construction's referring him to it. *See* Sechrist Construction's Response, 3/30/2018, at Exhibit A. Accordingly, we deny Mr. Harpster's August 14, 2018 application for relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/20/2018